## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

### Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety for about 16.5 years, the 8.5 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. §

841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

    2.    I make this application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices (hereinafter "**Subject Devices**") and their contents:

    a.    **Subject Device 1**: black Hot Pepper, model HPPL62A flip-phone, IMEI 358371951776890, with no case.

    b.    **Subject Device 2**: black iPhone 14, unknown model, unknown IMEI, with no case.

    c.    **Subject Device 3**: black iPhone 14 Plus, unknown model, unknown IMEI, with no case.

The **Subject Devices** were seized in the parking lot of Roosevelt Hill Apartments near 1334 Sherwood Avenue, Kalamazoo, MI, during the arrest of Devine SPENCER on September 17, 2024. **Subject Devices 1 & 2** were seized from SPENCER's person, **Subject Device 3** was seized from SPENCER's 1983 Chevrolet Caprice. The **Subject Devices** have remained in the custody of law enforcement.

    3.    The applied-for warrant would authorize the forensic examination of the **Subject Devices** identified above and in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.

4. I submit that there is probable cause to believe that evidence of Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C § 841(a)(1), will be found on the **Subject Devices.**

5. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This application is intended to show merely that there is probable cause for the requested search of the **Subject Devices** and does not set forth all of my knowledge about this matter.

## Probable Cause

*Background*

6. Devine SPENCER is a 27-year-old resident of Kalamazoo, MI.

7. SPENCER's has felony convictions for carrying a concealed weapon (2017) and fleeing/eluding police (2022).

*SPENCER is a Drug Trafficker*

8. In late 2023, a KVET confidential source[1] (CS) advised investigators that he/she could purchase crack cocaine and/fentanyl from SPENCER, who resided at 1334 Sherwood Ave, Kalamazoo, MI. The CS also advised that he/she contacted SPENCER by telephone at 313-721-2615.

9. Between December 1, 2023, and February 7, 2024, KVET investigators

---

[1] The KVET CS had conducted over 10 successful controlled buys under the direction of KVET and provided information to investigators on multiple occasions resulting in arrests and drug and weapon seizures. The CS is/was cooperating with KVET for monetary gain.

conducted three controlled buys from SPENCER utilizing the KVET CS. All three controlled buys were arranged by contacting SPENCER at 313-721-2615 and all three were successful in purchasing fentanyl or crack cocaine from SPENCER.

10. On February 8, 2024, KVET investigators executed a State of Michigan search warrant at 1334 Sherwood Ave, Kalamazoo, MI. In addition to the search warrant, SPENCER was on felony probation for a 2022 felony fleeing/eluding conviction out of the 9th Circuit Court in Kalamazoo, MI. As part of his probation conditions, SPENCER was subject to a search clause[2] of his person and residence.

11. During the execution of the search warrant, SPENCER was detained in the driveway of 1334 Sherwood Ave. Two cell phones and $2,830 US Currency were located on SPENCER's person.

12. During the search of the residence, investigators located approximately 29 grams of crack cocaine, 278 grams of methamphetamine, and 215 grams of fentanyl in SPENCER's bedroom (northeast bedroom). Additional evidence of drug trafficking was also located in the bedroom to include digital scales, a plate with fentanyl residue, sandwich bags, lottery tickets, a blender and a currency counter.

13. SPENCER was arrested on a probation violation charge and lodged at the Kalamazoo County Jail.

14. Analysis of the "Hot Pepper" flip-phone located on SPENCER's person

---

[2] Order of Probation – Docket B220508-FH – Condition 4.24 "*You submit to a search of your person and property, including but not limited to your vehicle, residence, and computer, without need of a warrant, if the field agent has reasonable cause to believe you have items which violate the conditions of your probation.*"

4

showed the device has phone number 313-721-2615, the number provided by the KVET CS and used to arrange the controlled buys and also showed additional evidence of drug trafficking in the form of text messages.

15. Based on this conduct, on September 11, 2024, SPENCER was indicted by a federal grand jury in the Western District of Michigan, charging him possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). A federal arrest warrant was issued for SPENCER on the same date. (Case 1:24-cr-00129-JMB)

*SPENCER's Arrest and Seizures of Subject Devices 1-3*

16. On September 17, 2024, KVET investigators located SPENCER at Roosevelt Hill Apartments near 1334 Sherwood Avenue, Kalamazoo, MI. SPENCER entered his black 1983 Chevrolet Caprice and appeared to be speaking with a male that had arrived in a tan pickup truck. KVET investigators moved in and arrested SPENCER on the outstanding federal arrest warrant. During a search of his person, **Subject Device 1** and **Subject Device 2** were located and seized.

17. Investigators contacted the driver of the tan pickup truck, NL. NL stated he came to Roosevelt Hill Apartments to purchase drugs from SPENCER,[3] specifically $10 worth of methamphetamine. NL said he contacted SPENCER at 313-721-2615 (same phone number from the Dec'23-Feb'24 investigation). NL added he purchases methamphetamine from SPENCER once a week and always comes to

---

[3] NL did not know SPENCER's real name, but identified him as the person arrested by law enforcement. NL knew him as "Kriss" which is also what he was saved as in NL's phone.

5

this location.

18. I called phone number 313-721-2615, the number used by NL to contact SPENCER to arrange the purchase of methamphetamine, and **Subject Device 1** rang, and my phone number appeared on the display.

19. Additionally, I had obtained results from a DEA/DOJ administrative subpoena on September 9, 2024, for 313-721-2615, which showed the subscriber to be "Devine Spencer-Bowden" with an address of 1334 Sherwood Ave, Kalamazoo, MI.

20. A KDPS K-9 gave an alert for the presence of controlled substances on SPENCER's Chevrolet Caprice. During the search of the vehicle, no controlled substances were located, however lottery tickets were located, a common item used for packaging controlled substances by drug traffickers. **Subject Device 3** was also located in the vehicle on the front bench.

21. KVET investigators secured 1334 Sherwood Ave, Kalamazoo for a search warrant. That same day, a Kalamazoo County magistrate/judge signed the search warrant.

22. During the execution of the search warrant, no one else was located inside.

23. During a search of the apartment, in the same northeast bedroom, identified as SPENCER's during the February 8, 2024 search, investigators located additional evidence of drug trafficking to include lottery tickets, 2 digital scales, inositol powder, and two baggies with a grey compressed powder I believed to be

heroin/fentanyl based on their appearance and their presence in an inositol bottle (common cutting agent for heroin/fentanyl).

    a.    The compress grey powder was submitted to the DEA laboratory for testing and was determined to be 28.793 grams of a mixture of N, N-Dimethylpentylone and Bromazolam.

    b.    N, N-Dimethylpentylone is a schedule I controlled substance. Bromazolam is not federally controlled.

24.    SPENCER was arrested on the outstanding federal warrant and lodged at the Kalamazoo County Jail, pending transfer to the USMS on Grand Rapids, MI the following day.

25.    The **Subject Devices** were seized by law enforcement and have remained in the custody of KVET in Kalamazoo, MI since.

26.    Based on my training and experience, I know that drug traffickers frequently use more than one cell phone to conduct their drug trafficking business. For example, I have encountered drug dealers that use one cell phone/phone number to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers.

27.    Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am also aware of the following:

    a.    Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in

their devices.

  b.  Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

  b.  Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

  d.  Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

  e.  It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers. These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

  f.  That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug

8

traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

      g.    User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

      h.    Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

## Technical Terms

28.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address

9

books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player

10

may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen

11

for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.  IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  29.  Based on my training, experience, and research, I know that the **Subject Devices** have capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices and other evidence of drug trafficking.

**Electronic Storage and Forensic Analysis**

30.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

31.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context,

13

be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.    I submit that this application supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the evidence of drug trafficking described in Attachment B.